Josiah Contarino
NJ Bar No. 003962013
CONTARINO ROTH LLC
101 Eisenhower Parkway, Suite 300
Roseland, NJ 07068
(973) 200-1926
jcontarino@contarinoroth.com

Lee E. Goodman (*pro hac vice* forthcoming)
lgoodman@dhillonlaw.com
Domenic P. Aulisi (*pro hac vice* forthcoming)
daulisi@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(703) 574-1093

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE; NEW JERSEY REPUBLICAN STATE COMMITTEE; THOMAS H. KEAN, JR.; and ANTHONY M. BUCCO,<br><br>Plaintiffs,<br><br>v.<br><br>SHIRLEY EMEHELU, in her official capacity as Secretary of State of New Jersey; DEBRA M. FRANCICA, in her official capacity as Superintendent of Elections and Commissioner of Registration of Bergen County, New Jersey; SCOTT SNYDER, in his official capacity as Commissioner of Registration of Middlesex County, New Jersey; MARYANNE KELLEHER, in her official capacity as Superintendent of Elections of Hudson County, New Jersey; JAMES FOERST, in his official capacity as Commissioner of Registration of Union County, New Jersey; and KEN SCHERER, in | Civil Action No. 3:26-cv-12522<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

his official capacity as Secretary of the Board of Elections of Somerset County, New Jersey,

Defendants.

Plaintiffs Republican National Committee, New Jersey Republican State Committee, Thomas H. Kean, Jr., and Anthony M. Bucco (collectively, "Plaintiffs"), by and through undersigned counsel, file this First Amended Complaint for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1. This is an action brought under the public disclosure provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507(i), to compel the disclosure of public records concerning New Jersey's programs and activities for maintaining the accuracy and currency of its official lists of eligible voters.

2. Section 8(i) of the NVRA commands that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . ." *Id.* § 20507(i)(1).

3. On July 31, 2026, Plaintiffs submitted written records requests under Section 8(i) to New Jersey's Secretary of State—the State's chief election official—and to the Superintendents of Elections or Commissioners of Registration of Bergen, Middlesex, Hudson, Union, and Somerset Counties.[1] The requests sought core categories of voter list-maintenance records,

[1] Plaintiffs contemporaneously submitted a request to Essex County. That request is not at issue in this lawsuit because, as noted below, Essex has agreed to produce all responsive records in its possession.

including records relating to: (1) the policies and procedures that govern New Jersey's list-maintenance programs; (2) registrants removed from the rolls and the codes under which they were removed; (3) address confirmation notices, inactive designations, and inactive-list removals; (4) data and communications exchanged with the state agencies and databases used to identify deceased, relocated, and non-citizen registrants; and (5) registrants removed as non-citizens.

4. For six weeks, the Secretary of State's office did not acknowledge the request. On September 15, 2026—the final day of the statutory cure period described below—outside counsel for the Department of State's Division of Elections responded. The response produced two lists generated from the State's voter registration system: (1) a list of deleted voters that does not identify the reason for which any registrant was deleted; and (2) a list of currently inactive voters that does not identify when any registrant was placed in inactive status. It objected to or denied every other category of the request, including the request for records of address confirmation notices that Section 8(i) expressly requires the State to maintain and make available upon request.

5. The county officials have done little more. Bergen County produced three reports, asserted that it holds no records responsive to three categories, and refused seven categories outright. On September 15, 2026, Bergen County reaffirmed each of those positions.

6. Union County produced records responsive to a handful of categories, refused five others on the ground that producing them would cause a "substantial disruption" to its operations, and declared its response "complete." On September 15, 2026, Union County produced a single additional record and reaffirmed its refusals.

7. Somerset County produced one report covering roughly half of the period requested and another that does not respond to the category it was offered to satisfy, declared that it lacks the ability to generate four categories, and closed the request.

8. Hudson County, whose County Counsel committed in writing to deliver the records by September 15, 2026, released on that date only twenty-five records concerning the reporting of deaths to its office, while stating that it was still processing the remainder of the request. On September 17, 2026—two days after the cure period expired and nearly fifty days after Plaintiffs sent their request—Hudson County produced records responsive to certain remaining categories, asserted that it possessed no records responsive to two others, and announced that its response to the request was complete.

9. Middlesex County produced nothing for nearly two months and twice treated the July 31 request as though it were first submitted weeks later. On September 28, 2026—after the cure period had expired and after Plaintiffs commenced this action—the Middlesex County Board of Elections produced five standard operating procedures and a set of email correspondence with federal agencies. It refused most of the remaining categories on the grounds that records in the State's voter registration system are maintained by the State, that producing them would require the creation of new records, and that Plaintiffs' requests were overly broad under OPRA.

10. Notwithstanding a clear request for records pursuant to Section 8(i) of the NVRA, each county that responded treated the request as though it were governed solely by New Jersey's Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 *et seq.*, and applied OPRA's deadlines, certifications, exemptions, and fees to it. The Secretary of State's response acknowledged the NVRA, but it construed Section 8(i) as imposing no obligation to make available records that must be retrieved from the State's voter registration system by query, to produce any record in electronic form, or to disclose records the State deems protected by state privacy laws.

11. On August 26, 2026, Plaintiffs provided each Defendant written notice of the violations pursuant to 52 U.S.C. § 20510(b)(1). Because the violations occurred within 120 days

before the date of an election for federal office—specifically, the November 3, 2026, general federal election—the NVRA afforded Defendants twenty days, or until September 15, 2026, to cure. 52 U.S.C. § 20510(b)(2).

12. As of the filing of this lawsuit, the cure period had expired. Although three Defendants made partial productions on the final day of that period, and two Defendants produced records after it expired, no Defendant has cured his or her violation. Accordingly, Plaintiffs bring this action for declaratory and injunctive relief compelling Defendants to make the requested records available in compliance with Section 8(i) of the NVRA.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, namely Section 8(i) of the NVRA, 52 U.S.C. § 20507(i).

14. The NVRA authorizes a person aggrieved by a violation of the statute to bring a civil action for declaratory and injunctive relief after providing written notice of the violation and after expiration of the applicable cure period. 52 U.S.C. § 20510(b). Each Plaintiff is aggrieved by the violations alleged herein, and each has satisfied the NVRA's notice requirement.

15. This Court is authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and 52 U.S.C. § 20510(b)(2), and to award the prevailing party reasonable attorneys' fees, including litigation expenses, and costs, under 52 U.S.C. § 20510(c).

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because each Defendant is an official of the State of New Jersey or one of its counties who is sued in his or her official capacity and resides in this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### I. Plaintiffs

17. Plaintiff Republican National Committee (the "RNC") is the national committee of the Republican Party, as defined by 52 U.S.C. § 30101(14), with its principal place of business at 310 First Street SE, Washington, D.C. 20003. In addition to managing the Republican Party's business at the national level, the RNC supports Republican candidates for public office at all levels, including in New Jersey; coordinates fundraising and election strategy; and develops and promotes the national Republican Platform. The RNC represents over thirty-five million registered Republicans in all fifty states, the District of Columbia, and the U.S. territories, and it comprises 168 voting members representing state and territorial Republican Party organizations, including Plaintiff New Jersey Republican State Committee.

18. The RNC is not a bystander to New Jersey's administration of its voter rolls. The RNC acquires New Jersey's voter registration lists on an ongoing schedule and relies on those lists to conduct the core political activities for which the RNC exists, including: (a) encouraging registered voters to vote; (b) identifying individuals who are not registered in order to register them; (c) contacting registered voters; (d) sending political communications to registered voters; and (e) developing voter data that the RNC shares with other party committees, candidates, and allied groups, which those committees, candidates, and groups use to register and turn out voters in federal elections.

19. Each of those activities is intended to increase the number of eligible citizens who register to vote and to enhance the participation of eligible citizens as voters in elections for federal office in New Jersey. The RNC has engaged in these activities in every federal election and in many state elections in New Jersey, and it plans to do so in the 2026, 2028, and 2030 election cycles. In the November 3, 2026, general election alone, New Jersey will elect one United States

Senator and all twelve of New Jersey's members of the United States House of Representatives, and the RNC intends to participate in those races by supporting Republican nominees.

20. The effectiveness of the RNC's political activities depends upon the accuracy of the State's voter lists. If the lists are inaccurate, the RNC wastes limited resources attempting to contact registrants who are deceased, have moved, or are otherwise no longer at the address listed on New Jersey's voter rolls. Every contact wasted on a nonexistent, relocated, deceased, or otherwise ineligible registrant is a contact not made to an eligible, unregistered citizen or a low-propensity voter, directly reducing the registrations and votes that the RNC's limited budget produces.

21. Inaccurate rolls thus injure the RNC twice over: they impair the RNC's political mission, and they inflict financial harm by consuming resources on individuals who cannot be registered or reached at the addresses New Jersey lists for them.

22. Because inaccurate voter lists impair its political efforts, the RNC periodically requests voter list-maintenance records from the states, including New Jersey, so that it can verify, correct, and update its internal voter file and ensure that its registration, turnout, and voter-contact programs operate on accurate and current data. The RNC also regularly analyzes state list-maintenance practices to determine whether voter rolls are accurate, educate voters, assist affiliated committees and candidates, and promote compliance with federal law.

23. A further core mission of the RNC is to ensure the integrity of the electoral process in which the RNC directly participates and competes for votes. To that end, the RNC conducts regular programs, including election-day operations and poll monitoring, to ensure the integrity and accuracy of election administration, including the accuracy of voter rolls and the list-maintenance efforts of states such as New Jersey. The RNC plans and executes those programs in

New Jersey in reliance on the voter registration lists that Defendants maintain and on the list-maintenance records that Section 8(i) makes public. The RNC cannot know who has been removed from New Jersey's rolls, when, and why unless Defendants make the records of those removals available.

24. Plaintiff New Jersey Republican State Committee ("NJGOP") is the state committee of the Republican Party in New Jersey, organized under New Jersey law, with its principal place of business at 150 W. State Street, Suite 230, Trenton, NJ 08608. NJGOP is the Republican Party's official state party organization in New Jersey. It is organized and operates on behalf of the Republican Party and its members, candidates, and voters throughout New Jersey, and it coordinates with county and municipal Republican organizations across the state, including in Bergen, Middlesex, Hudson, Union, and Somerset Counties.

25. NJGOP conducts the same categories of activity in New Jersey as the RNC—including voter registration drives, get-out-the-vote programs, voter communications, candidate support, and election monitoring—and those activities likewise depend on accurate rolls and on public access to the records documenting their maintenance.

26. The members of the RNC and NJGOP include registered New Jersey voters and Republican candidates for federal and state office in New Jersey, including in each of the five counties whose election officials are named as Defendants.

27. Plaintiff Thomas H. Kean, Jr. is the United States Representative for New Jersey's Seventh Congressional District and a candidate for re-election to that office. Congressman Kean won the Republican nomination in the June 2, 2026, primary election and will appear on the ballot in the November 3, 2026, general election. The Seventh Congressional District includes portions of Union County and Somerset County, among others.

28. Congressman Kean's campaign registers voters, communicates with voters, turns out voters, and monitors election administration within the Seventh Congressional District, and his election will be conducted on the voter registration rolls whose maintenance the requested records document. As a candidate for elected office, Congressman Kean also has an inherent interest in ensuring that the State and the counties within his district are maintaining voter rolls in accordance with federal law.

29. Plaintiff Anthony M. Bucco is a New Jersey State Senator representing the Twenty-Fifth Legislative District and serves as the Republican Leader of the New Jersey Senate. Senator Bucco will be a candidate for re-election in New Jersey's 2027 general election, which will be conducted on the same statewide voter registration rolls—maintained through the same statewide programs and systems—that are the subject of Plaintiffs' July 31, 2026, requests. As a candidate for elected office, Senator Bucco has an inherent interest in ensuring that the State and the counties within his district are maintaining voter rolls in accordance with federal law.

**II. Defendants**

30. Defendant Shirley Emehelu is the Acting Secretary of State of New Jersey (the "Secretary") and is sued in her official capacity. The Secretary is New Jersey's chief election official and, accordingly, is responsible for the coordination of the State's responsibilities under the NVRA. N.J.S.A. 19:31-6a; 52 U.S.C. § 20509. As New Jersey's chief election official, the Secretary oversees the New Jersey Division of Elections. Acting through its chief election official, New Jersey is required by federal law to implement a single, uniform, official, centralized, interactive, and computerized statewide voter registration list—New Jersey's Statewide Voter Registration System ("SVRS")—that is defined, maintained, and administered at the State level. 52 U.S.C. § 21083(a)(1)(A).

31. Defendant Debra M. Francica is the Superintendent of Elections and Commissioner of Registration of Bergen County and is sued in her official capacity. Her office maintains Bergen County's voter registration records, sends address confirmation notices to Bergen County registrants, designates registrants inactive, and removes Bergen County registrants from the SVRS. *See* N.J.S.A. 19:31-15.

32. Defendant Scott Snyder is the Commissioner of Registration of Middlesex County and is sued in his official capacity. His office maintains Middlesex County's voter registration records, sends address confirmation notices to Middlesex County registrants, designates registrants inactive, and removes Middlesex County registrants from the SVRS. *See id.*

33. Defendant Maryanne Kelleher is the Superintendent of Elections of Hudson County and is sued in her official capacity. Her office maintains Hudson County's voter registration records, sends address confirmation notices to Hudson County registrants, designates registrants inactive, and removes Hudson County registrants from the SVRS. *See id.*

34. Defendant James Foerst is the Commissioner of Registration of Union County and is sued in his official capacity. His office maintains Union County's voter registration records, sends address confirmation notices to Union County registrants, designates registrants inactive, and removes Union County registrants from the SVRS. *See id.*

35. Defendant Ken Scherer is the Secretary of the Somerset County Board of Elections and is sued in his official capacity. His office maintains Somerset County's voter registration records, sends address confirmation notices to Somerset County registrants, designates registrants inactive, and removes Somerset County registrants from the SVRS. *See id.*

## FACTUAL BACKGROUND

### I. The National Voter Registration Act of 1993

36. Congress enacted the NVRA to increase the number of eligible citizens who register to vote in elections for federal office, to enhance the participation of eligible citizens as voters, to protect the integrity of the electoral process, and to ensure that accurate and current voter registration rolls are maintained. 52 U.S.C. § 20501(b).

37. To those ends, Section 8 of the NVRA prescribes requirements for the administration of voter registration for federal elections, including the programs states must conduct to remove ineligible voters from the voter rolls and the safeguards that govern those removals. *Id.* § 20507. Among other things, Section 8 directs each State to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of the registrant's death or a change in the registrant's residence. *Id.* § 20507(a)(4).

38. Section 8(i) makes the operation of those programs public. It provides that "[e]ach State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . ." *Id.* § 20507(i)(1).

39. Those records expressly "include lists of the names and addresses of all persons to whom notices described in [52 U.S.C. § 20507(d)(2)] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." *Id.* § 20507(i)(2).

40. The phrase "all records," as used in Section 8(i), carries an expansive meaning. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012). Section 8(i)'s

disclosure obligation extends to voter registration data maintained in a statewide voter registration system, and it preempts state-law restrictions that pose an obstacle to the disclosure the NVRA mandates. *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 47–48, 54–55 (1st Cir. 2024).

41. The obligations Section 8(i) imposes belong to the State. A State may not delegate its responsibilities under the NVRA to local officials and, thereby, avoid responsibility when the State's program falls short of the statute's requirements. *See United States v. Missouri*, 535 F.3d 844, 849–51 (8th Cir. 2008). In such circumstances, the State must either improve its methods for securing local compliance or assume direct responsibility for the task itself. *Id.*

42. New Jersey conducts its voter list-maintenance program through county commissioners of registration and superintendents of elections, who send address confirmation notices, process registrants' responses, designate registrants inactive, and remove registrants from the SVRS. *See* N.J.S.A. 19:31-15. The SVRS itself is administered at the State level under the direction of the chief election official of the State of New Jersey. 52 U.S.C. § 21083(a)(1)(A).

43. Because New Jersey delegates many of its list-maintenance activities to its localities, many NVRA records reside in the custody of the local Superintendents of Elections and Commissioners of Registration.

44. The NVRA is enforceable through a private right of action. A person aggrieved by a violation may provide written notice of the violation to the chief election official of the State involved. 52 U.S.C. § 20510(b)(1). If the violation is not corrected within ninety days after the receipt of such notice—or within twenty days after receipt of the notice, if the violation occurred within 120 days before an election for federal office—the aggrieved person may bring a civil action for declaratory and injunctive relief. 52 U.S.C. § 20510(b)(2). A prevailing plaintiff may be allowed reasonable attorneys' fees, including litigation expenses and costs. 52 U.S.C. § 20510(c).

## II. The July 31, 2026, Records Requests

45. On July 31, 2026, Plaintiffs, through counsel, transmitted written records requests to the Secretary and to the offices of each of the five county Defendants. Each request was sent by email to the recipient office's published address and by certified mail, and each was made on behalf of all four Plaintiffs, who were identified by name in the request.

46. Each request explained that Plaintiffs register voters, conduct get-out-the-vote efforts, communicate with voters, and monitor elections in reliance on New Jersey's public voter registration lists; that those activities depend on accurate voter rolls; and that Plaintiffs were conducting a review of New Jersey's programs and practices for maintaining accurate voter rolls.

47. The request to the Secretary sought eleven categories of records (the "State Requests"):

(a) Each policy, procedure, manual, directive, guidance document, and training material describing New Jersey's voter list-maintenance programs and activities, including how deceased and relocated registrants are identified and removed, how confirmation notices are sent and processed, how registrants are designated inactive and removed from the inactive list, how duplicate registrations are handled, how citizenship is verified, and the meaning of each removal code used in the SVRS (State Request No. 1);

(b) SVRS records sufficient to identify each registrant removed or canceled under ten specifically identified removal codes, together with the date and code of each removal (State Request No. 2);

(c) Records identifying persons sent address confirmation notices and whether each responded (State Request No. 3);

(d) Records identifying registrants placed in inactive status (State Request No. 4);

(e) Records identifying registrants removed from the inactive list (State Request No. 5);

(f) Records and communications exchanged with the New Jersey Department of Health's Office of Vital Statistics and Registry ("Vital Statistics") concerning deceased registrants (State Request No. 6);

(g) Records and communications exchanged with the New Jersey Motor Vehicle Commission ("MVC") concerning registrants who have moved (State Request No. 7);

(h) Records generated from the office's use of the Systematic Alien Verification for Entitlements ("SAVE") database (State Request No. 8);

(i) Records and communications exchanged with the Electronic Registration Information Center ("ERIC") (State Request No. 9);

(j) Records and communications exchanged with county election officials concerning list-maintenance programs, compliance failures, and voters removed or slated to be removed (State Request No. 10); and

(k) Records identifying each person removed from the SVRS because of his or her status as a non-citizen (State Request No. 11).

48. A copy of the request sent to the Secretary is attached hereto as **Exhibit A**.

49. The requests to the five county Defendants sought thirteen categories of records (the "County Requests") that repeat the request to the Secretary and add two additional categories:

(a) Records and communications concerning the comparison of voter registration records to juror questionnaires or jury pool records (County Request No. 10); and

(b) Records and communications with U.S. Citizenship and Immigration Services ("USCIS") concerning citizenship and voter list maintenance (County Request No. 13).

50. In the County Requests, communications with other county election officials are County Request No. 11, and records identifying persons removed as non-citizens are County Request No. 12.

51. Copies of the requests sent to each county Defendant's office are attached hereto as **Exhibit B**.

52. Each request defined the "Relevant Period" as the period beginning January 1, 2023, and continuing through the date of the recipient's response, and each defined "record" to include documents, information, and data in electronic or paper form, including data found within the SVRS.

53. Each request specified that records identifying voters should include each voter's name, residence address, date (or year) of birth, and the voter identification number assigned by the SVRS, and each stated that Plaintiffs would accept the redaction of any full or partial Social Security number.

54. Each request rested on Section 8(i) of the NVRA and invoked OPRA only in the alternative, to the extent the recipient contended that a record fell outside the NVRA's scope.

55. Each request asked the recipient to acknowledge receipt within five business days—that is, by August 7, 2026—and to produce responsive records on a rolling basis in

electronic form. Each request further asked the recipient to provide a log identifying any withheld records and the basis for such withholding.[2]

56. As detailed below, each Defendant received the request directed to that Defendant's office.

### III. The Secretary's Delayed and Incomplete Response

57. The Secretary's office did not acknowledge the request by August 7, 2026, as requested, or at any time before September 15, 2026.

58. OPRA, which the request invoked in the alternative, requires the office to grant or deny access to the requested records "as soon as possible, but not later than seven business days after receiving the request," and provides that a failure to respond within that period "shall be deemed a denial of the request." N.J.S.A. 47:1A-5(i)(1). The request was transmitted by email and certified mail on Friday, July 31, 2026. Even treating the request as received on Monday, August 3, 2026, the seventh business day after receipt was August 12, 2026. The Secretary's office neither granted nor denied access by that date and gave no notice of an extension. The request was, therefore, deemed denied under OPRA no later than August 12, 2026.

59. As of August 26, 2026—nearly one month after the request—the Secretary's office had produced no records, requested no additional time, asserted no exemption, and provided no log. It had not communicated with Plaintiffs at all. Nor did it respond to the written notice of violation that Plaintiffs served on it that day, as described below, for another twenty days.

60. The SVRS that the Secretary administers at the State level is the repository of the registration and list-maintenance data at the center of the request, and the majority of the requested

[2] If, and only if, the New Jersey official asserted that a record was exempt from disclosure under the NVRA, then the record was alternatively requested pursuant to OPRA. This lawsuit does not assert any claims under OPRA.

categories concern records of programs the State conducts through that system. The Secretary's office holds, or can generate from the SVRS, records responsive to the request.

61. On September 15, 2026—the twentieth and final day of the statutory cure period—outside counsel for the New Jersey Department of State, Division of Elections (the "Division"), responded by letter and email to Plaintiffs' July 31 request and August 26 notice. That letter was the first communication of any kind from the Secretary's office concerning the request.

62. The letter stated that the Division "agrees to make available the following: (i) a list of voters deleted from New Jersey's voter rolls between January 1, 2023, and September 11, 2026, and (ii) a list of all inactive voters in the State as of September 11, 2026," and that Plaintiffs "either lack authority to obtain records and information beyond these documents, or such records and information do not exist or cannot feasibly be produced by the Division." The Division offered those two lists as its response to State Request Nos. 2, 4, 5, and 11.

63. The list of deleted voters does not identify the removal code or reason under which any registrant was deleted. State Request No. 2 specifically sought that information, and the SVRS records it for every deletion. As the Division's letter itself explains, "[w]hen a voter's status is marked as deleted, the SVRS user must select a reason." Without that field, the list does not show which registrants were removed under the ten codes enumerated in State Request No. 2, which registrants were removed from the inactive list (State Request No. 5), or which registrants were removed as non-citizens (State Request No. 11).

64. The list of inactive voters does not identify the date on which any registrant was placed in inactive status, information State Request No. 4 specifically sought. By the Division's own description, the list is a snapshot of "all currently inactive voters" as of September 11, 2026, rather than a record of the registrants placed in inactive status during the Relevant Period. The

letter stated that "[t]he SVRS system does not allow the Division to run a report to output the date the voter was made inactive." Defendant Foerst's office (Union County), however, generated from the same system a report (described below) of Union County registrants' status changes that records the date of each change.

65. As to State Request No. 1, the Division produced no policy, procedure, manual, directive, guidance document, or training materials. It objected that the request "fails to identify records with specificity," summarized the statutory provisions governing removals, and "refer[red] [Plaintiffs] to the Election Guides issued by the Division" on a public webpage (https://www.nj.gov/state/elections/doe-publications.shtml). This link directs a viewer to a webpage published by the Division titled "Printable Flyers & Publications." The webpage contains links to numerous guides, including printable flyers for poll workers; the Voters' Bill of Rights; voting district maps; documents concerning New Jersey's 2022 congressional redistricting; and election guides concerning, among other things, the use of ballot drop boxes, primary election ballot design, and ballot review guides. **The webpage contains *no* documents outlining New Jersey's voter list-maintenance program under the NVRA**.[3] Apart from this webpage and the "Guide to MVC Voter Registration Error," to which the Division referred in response to State Request No. 10, the Division identified **no directive, guidance, or training materials concerning list maintenance**, despite the letter stating that, in preparing for the November 3, 2026, election, the Division has been **"reviewing, updating, and preparing guidance documents."**

---

[3] The only document accessible from this page that is remotely responsive is titled "Guide to MVC Voter Registration Error." This six-page guidance document describes a registration system error that occurred between June 2023 and June 2024, and it does not outline New Jersey's general list-maintenance program.

66. As to State Request No. 3, the Division acknowledged that "the information requested—a list of every individual voter who was sent an address confirmation for voter registration purposes during the relevant timeframe and whether that individual responded—exists within the SVRS as 'correspondence history' attached to each individual voter's record." It nonetheless denied the request on the ground that "the SVRS reporting module is not programmed to automatically generate a report that displays a list of all voters that have been issued a confirmation notice along with the date the notice was printed." Section 8(i)(2) identifies those records by name as records the State must maintain and make available, and the Division does not deny that it maintains them.

67. As to State Request Nos. 6–10, the Division objected to each request, quoting N.J.S.A. 47:1A-5(g), on the basis that they "fail[] to 'identify a specific job title or accounts to be searched, a specific subject matter, and is not confined to a reasonable time period'" and that State Request Nos. 6–9 are, therefore, "improper." The Division did not cite any exemption under Section 8(i) of the NVRA that would require such details. The Division produced **no record** in response to any of these requests in violation of the NVRA. Beyond those objections, the letter stated:

(a) That the transmission of death data to county election officials under N.J.S.A. 19:31-16(b) "is accomplished by the SVRS retrieving raw data files from the New Jersey Department of Health," but that no records or communications "exchanged . . . between" the Division and the Department of Health meet "the criteria specified in this request," and that the data files are, in any event, confidential under state law—specifically, N.J.S.A. 26:8-4, N.J.S.A. 26:8-23, and N.J.A.C. 8:2A-2.1 to 2.4 (State Request No. 6);

(b) That, when a registrant updates an address through the MVC, the "updated records are transmitted to the SVRS for review and use by county election officials," and that the Division "does not regularly exchange communications with the MVC identifying voters who have moved for voter list-maintenance purposes" (State Request No. 7);

(c) That "the SVRS is not integrated with" SAVE and that "the Division has not used the SAVE database in conjunction with maintenance of voter registration data" (State Request No. 8);

(d) That New Jersey was not producing records in its possession related to ERIC because, although New Jersey is a member of ERIC, "the State is only currently receiving In State Duplicate Reports from the ERIC system," and that "[t]he Division is reviewing those reports to determine whether they can be produced" (State Request No. 9); and

(e) That the request "is vague and overbroad," and that the Division "refers [Plaintiffs] to the Guide to MVC Voter Registration Error issued by the Division" on its website (State Request No. 10).

68. The ERIC reports the Division acknowledges receiving are records exchanged between the Division and ERIC and are responsive to State Request No. 9. The Division has neither produced them nor identified any basis under Section 8(i) for withholding them.

69. Likewise, the Department of Health data files that the Division acknowledges the SVRS retrieves, and the MVC change-of-address records that the Division acknowledges are transmitted to the SVRS, are records exchanged with those agencies for voter list-maintenance

purposes and are responsive to State Request Nos. 6 and 7, whether the exchange occurs through electronic transmission, an automated interface, or paper correspondence.

70. As to State Request No. 11, the Division stated that "[t]he reasons within the SVRS for which a voter can be deleted do not include non-U.S. citizenship," that "the SVRS cannot generate an automated report that displays a list of all voters that have been deleted on the basis of non-U.S. citizenship," and that, "[t]herefore, [Plaintiffs'] request must be denied." The Division has the information in the SVRS, and it can be accessed, so it must provide it. In any event, this request was not limited to those records that can be generated from the SVRS, but rather encompasses *all records* in the State's possession concerning individuals removed from the SVRS because they were non-citizens. To the extent the Division has any such records, they must be produced.

71. The letter did not offer to make any withheld record, including information maintained in the SVRS, available for public inspection in any form or at any place, and it provided no log identifying the records withheld.

72. As of the filing of this Amended Complaint—more than eight weeks after the request and more than a month after Plaintiffs' statutory notice—the Secretary's office has, accordingly, failed to make available any records in response to State Request Nos. 1, 3, and 6–10; has produced incomplete records in response to State Request Nos. 2 and 4; and has offered, in response to State Request Nos. 5 and 11, records that do not identify the registrants those requests seek.

## IV. Defendant Francica's Refusal (Bergen County)

73. On August 10, 2026, Defendant Francica's office (Bergen County) responded to the request by email.

74. The response attached two reports generated from the SVRS:

(a) A report of voter registrations deleted during the Relevant Period, produced in response to County Request No. 2; and

(b) A report of registrants removed from the inactive list, produced in response to County Request No. 5.

75. The response also included an additional report of registrants removed as non-citizens from 2023 through August 10, 2026, produced in response to County Request No. 12.

76. Each of the reports omits the registrants' dates or years of birth, which the request specified should be included in records identifying voters. The productions in response to County Request Nos. 2, 5, and 12 are, therefore, incomplete.

77. The response stated that the office has "[n]o responsive records" for County Request No. 1 (the office's list-maintenance policies, procedures, and training materials), County Request No. 3 (records of confirmation notices sent and responses received), and County Request No. 4 (records of registrants placed in inactive status).

78. The response refused County Request Nos. 6–11 and 13—categories seeking the office's data exchanges and communications with Vital Statistics, the MVC, SAVE, ERIC, the jury system, other election officials, and USCIS—on the sole ground that those requests "are improper under OPRA as they do not meet the requirements needed to conduct a search for communications under the law."

79. The response did not address the NVRA, did not assert that any refused category falls outside Section 8(i), and provided no log of withheld records.

80. The office's own productions contradict its assertion that it holds no records responsive to County Request Nos. 1, 3, and 4. The office's reports reflect approximately 74,000 registration cancellations under nine distinct removal codes during the Relevant Period. An

operation of that scale is conducted under written policies and procedures, whether issued by the office itself or by the Division, and each such policy or procedure was sought by County Request No. 1. The reports likewise reflect approximately 36,000 removals under the code "Inactive Confirmation Through Two Federal," each of which indicates that a confirmation notice was sent and that the registrant was placed in inactive status. Moreover, Section 8(i)(2), 52 U.S.C. § 20507(i)(2), expressly identifies records of those notices and responses as records the State must maintain, and the SVRS can be queried to retrieve them, as the office's own reports demonstrate. Essex County, which was sent the same request on July 31, reported that SVRS inactivation and removal reports for the Relevant Period exist, and it produced them.

81. The office's non-citizen report likewise confirms that records responsive to the refused categories exist. The report traces 91 of 134 listed removals to registrations effected through the MVC, and it reflects removals recorded in coordination with other counties. The records underlying those entries are among the records that County Request Nos. 11 and 13 seek.

82. On September 15, 2026, Defendant Francica's office responded to Plaintiffs' August 26 notice, reaffirming its earlier positions. Defendant Francica produced no additional records with this response and has produced nothing further since that date.

83. As of the filing of this Amended Complaint, Defendant Francica's office has, accordingly, failed to make available any records in response to County Request Nos. 1, 3, 4, 6, 7, 11, and 13, and has produced incomplete records in response to County Request Nos. 2, 5, and 12.

**V. Defendant Snyder's Belated Response and Refusal (Middlesex County)**

84. The request was transmitted on July 31, 2026, by email to the address of the office that maintains Middlesex County's registration records and by certified mail to Defendant Snyder.

85. The County's first substantive communication arrived on August 21, 2026—three weeks after the request was sent—when the Clerk of the Board of County Commissioners wrote

that she "was forwarded [Plaintiffs'] OPRA request from our County Board of Elections," and that "[i]n order to submit th[e] request," counsel would need to certify, under penalty of N.J.S.A. 2C:28-3, whether counsel had been convicted of any indictable offense, whether the records would be used for a commercial purpose, and whether the records were sought in connection with a legal proceeding. The email stated that "[o]nce these 3 questions are answered, I can submit the OPRA request accordingly."

86. Counsel provided each certification in reply the same day.

87. On August 24, 2026, the County's OPRA Center sent an automated acknowledgment stating that the request "was received in this office on August 24, 2026 and given the reference number W025667-082426 for tracking purposes."

88. On August 26, 2026, after Plaintiffs served the statutory notice described below, the County Board of Elections replied: "We are in receipt of your correspondence." It said nothing more.

89. Each of those communications treated the request exclusively as an OPRA request. None addressed the NVRA, none produced any records in response, and none identified a date by which the office would produce responsive records.

90. Defendant Snyder's office produced no records by the September 15, 2026, cure deadline, and it had produced none when Plaintiffs commenced this action on September 22, 2026.

91. On September 28, 2026—fifty-nine days after the request was sent, thirteen days after the cure period expired, and six days after Plaintiffs commenced this action—the Administrator of the Middlesex County Board of Elections emailed Plaintiffs' counsel a written response to the request, copied to Defendant Snyder.

92. The County's response acknowledged that Plaintiffs had requested records "pursuant to the National Voter Registration Act ('NVRA'), 52 U.S.C. § 20507(i), and the New Jersey Open Public Records Act ('OPRA')," but it withheld records on grounds drawn solely from OPRA and other provisions of state law. It identified no basis under the NVRA for withholding any records and provided no log of withheld records. As to the individual categories of records, the County's response stated:

(a) As to County Request No. 1, that Plaintiffs should consult "the pertinent statutory and regulatory law (N.J.S.A. 19:31-5, et seq.)" and the "applicable Standard Operating Procedures" enclosed with the response. The office enclosed five procedures, which concern (1) the processing of deceased registrants; (2) the processing of registrations and address changes received from the MVC and through online voter registrations; (3) the processing of sample ballots returned by the Postal Service; (4) the research of provisional ballots; and (5) the processing of applications from military and overseas voters.

(b) As to County Request Nos. 2, 4, 5, and 12, that, under OPRA, a "public agency shall not be considered to be in possession of a public record that is created, maintained, or received by another public agency and made available to the public agency either by remote access to a computer network or by distribution as a courtesy copy," that "all records pertaining to the SVRS are maintained by the State of New Jersey," and that requests for those records "should be directed to that entity"; and, as to County

Request Nos. 4 and 5, that "the Middlesex County Board does not have any responsive records."

(c) As to County Request No. 3, that "the records sought cannot be generated through a report," that "the records custodian would have to review the 'correspondence history' for each individual voter's record and effectively create a new record by collating and compiling the correspondence history from various unidentified voters," and that, "because there are no responsive records, the request must be denied."

(d) As to County Request Nos. 6, 10, 11, and 13, that each "request for correspondence is overly broad" because, under OPRA, "[a] custodian shall not be required to complete a request, including for, but not limited to, mail, email, text messages, correspondence, or social media postings and messages, if the request does not identify a specific job title or accounts to be searched, a specific subject matter, and is not confined to a reasonable time period."

(e) As to County Request No. 7, "[s]ee response to # 5."

(f) As to County Request No. 8, that "[t]here are no records responsive to this request."

(g) As to County Request No. 9, "[s]ee response to # 5 AND 2 as any communications from ERIC regarding In State Duplicate Reports would be addressed to the Secretary of State, Division of Elections."

(h) As to County Request No. 10, additionally, that "jury questionnaires and jury pool records are confidential and accordingly there are no records responsive."

(i) As to County Request No. 13, that, "[w]hile the request is not compliant with OPRA, please see attached correspondence." The enclosed correspondence consists of email exchanges between the office and a special agent of the Federal Bureau of Investigation and immigration officers of USCIS concerning the registrations of non-citizens.

93. The office's production in response to County Request No. 1 is incomplete. That request sought each responsive record "in effect at any time during the Relevant Period," which began on January 1, 2023. Each procedure the office produced, however, is dated 2026. The office produced no procedure in effect during 2023, 2024, or 2025. None of the five procedures describes how registrants reactivate from inactive status, how registrants on the inactive list are removed from the registration list, or how the office verifies the citizenship of registrants, and none sets forth the meaning and application of the removal codes used in the SVRS. The procedures concerning deceased voters also refer to a responsive record that the office did not produce: the Board of Elections' "SVRS operational procedures."

94. The office's position that all records pertaining to the SVRS are maintained by the State cannot be reconciled with the office's own records. The office's procedures direct its staff to record deletions and changes in registrants' status in the SVRS and to scan the source documentation into the SVRS, and they note that "the SVRS audit log records the transaction." The office's own correspondence also shows that it retrieves SVRS records and furnishes them to others upon request. On March 31, 2026, the Administrator sent a special agent of the Federal

Bureau of Investigation "the attached voter profiles for those requested." On July 8, 2026, an immigration officer with USCIS asked the office for a "full SVRS record" for a particular registrant, "including all data fields (such as registration source, registration date, registration type, status history, and any audit/change history showing when the registration was created and when it was deleted)," and on July 15, 2026, the Administrator replied: "Please see attached, as you requested." Bergen, Hudson, Union, and Somerset Counties each generated reports from the SVRS in response to the same request.

95. The office's response to County Request No. 3 does not deny that the office maintains the information that request seeks. Indeed, it acknowledges that the information resides in the "correspondence history" of each registrant's record. That the information cannot be generated through a single report does not excuse its withholding.

96. The office's assertion that it has no records responsive to County Request Nos. 4 and 5 is contradicted by its own procedures. The procedure for returned sample ballots directs staff, when a registrant's sample ballot is returned as undeliverable and there are "no changes to the address in SVRS after the election," to "make the voter's status inactive," to enter the election date as the "CHANGE DATE," and to record in the "CHANGE MEMO AND NOTES SECTION" that the registrant is "inactive per 'election code' SB." The SVRS thus records, for each registrant the office places in inactive status, the date of and basis for that change—the very information County Request No. 4 seeks. The office's MVC procedure, in turn, instructs staff not to activate the records of "Deleted/Inactive through 2 Federal Voters," confirming that the SVRS identifies the registrants removed from the inactive list whom County Request No. 5 seeks.

97. OPRA's limitation on requests for correspondence has no counterpart in Section 8(i), and County Request No. 6 is not limited to correspondence. It seeks records that identify

deceased individuals for voter list-maintenance purposes, "including data files, death lists or indices, match or comparison results, and correspondence transmitting or discussing that information." Moreover, the office's procedure for processing deceased registrants identifies the responsive records clearly. It requires that the office "have a record that can be cited and retained as the source of the deceased-voter action"; it lists the acceptable sources of death information, including "Department of Health / vital records," "Municipal Clerk or municipal death-record report," and "Notification from another county"; it describes the office's practice to "request regular bi-monthly deceased-resident reports from municipal clerks for review"; and it directs staff to "[r]etain the source document in the Board's deceased-voter file," in the case of paper records, and to "[r]etain the Death Notice List and associated deceased-voter documentation for two (2) years." Those reports, notifications, and lists are records responsive to County Request No. 6 and, to the extent exchanged with municipal clerks and other counties, to County Request No. 11. The office produced none of them.

98. The office's correspondence and procedures also confirm that it holds records responsive to County Request No. 7. In the correspondence enclosed with the County's response, the Administrator informed USCIS that "[t]he Middlesex County Board of Elections receives voter registration records electronically from the New Jersey Motor Vehicle Commission (MVC) through the State's Voter Registration System (SVRS)." The office's procedure for processing those records provides that, when an existing registrant changes his or her address through an online MVC transaction, the "Update Reason" is "MVC Online Transfer." The MVC records through which the office learns that registrants have moved—records that, according to the Division, are "transmitted to the SVRS for review and use by county election officials"—are responsive to County Request No. 7. The office produced none of them.

99. The office's response to County Request No. 12 fails for reasons set out above regarding the SVRS. Additionally, correspondence enclosed with the County's response concerns inquiries that federal investigators made to the office during the Relevant Period about non-citizen registrants, including at least one registrant who, according to USCIS, had been removed from the voter rolls.

100. The office's production in response to County Request No. 13 is also incomplete. The enclosed correspondence reflects that, on July 15, 2026, the office transmitted records to USCIS as attachments to two emails, but the office did not produce those attachments.

101. The County's belated response did not cure the office's violation. As of the filing of this Amended Complaint, Defendant Snyder's office has, accordingly, failed to make available any records in response to County Request Nos. 2–7, 11, and 12, and has produced incomplete records in response to County Request Nos. 1 and 13.

**VI. Defendant Kelleher's Delayed and Incomplete Production (Hudson County)**

102. The request was transmitted on July 31, 2026, by email to the address of the Hudson County Superintendent of Elections and by certified mail to Defendant Kelleher.

103. On August 7, 2026, Defendant Kelleher's office replied by email, stating "[w]e are in receipt of your OPRA request via email. Kindly submit your OPRA request to the Hudson County OPRA Portal," because the County "requests that OPRA requests come through the portal for efficient delivery/response and required attestations." The reply did not address the NVRA, did not address the substance of the request, and did not identify any date by which the office would respond.

104. On August 10, 2026, as Defendant Kelleher's office requested, Plaintiffs' counsel entered the request into the County's public records portal. That re-transmission changed neither the date of the request nor the date on which the office's obligation to respond attached. The portal

generated an automated acknowledgment stating that the request "was received in this office on 8/10/2026," that it "will be forwarded to the relevant department(s) to locate the information you seek and to determine the volume and any costs associated with satisfying your request," and that Plaintiffs would "be contacted about the availability and/or provided with copies of the records in question."

105. On August 26, 2026—the same day on which Plaintiffs served notice on Defendant Kelleher regarding her failure to respond to the request—Defendant Kelleher's office notified Plaintiffs that their "request was closed in error," that the office would "need additional time" to complete the request, and that it would "send all documents and close [the request]," if the request is "completed by the due date."

106. On September 1, 2026, Plaintiffs' counsel conferred with the Hudson County Counsel, who represented that Hudson County would complete its production by no later than September 15, 2026.

107. To the extent Defendant Kelleher's office intended to fulfill the request under OPRA, the "due date" for the request was no later than Wednesday, August 19, 2026, even treating the request as made on August 10. None of the office's communications acknowledged the NVRA or the office's obligation to make the records available under Section 8(i).

108. On September 15, 2026—the date by which Hudson County Counsel had committed to complete the County's production and the final day of the statutory cure period—Plaintiffs' counsel received notice that "[t]he law department is processing the documents requested and making necessary redactions," and that "[t]hose records which have been approved for release have been uploaded [to the County's records portal] and made available to you."

109. The records released on September 15, 2026, consist of twenty-five documents, each of which is, or accompanies, a report of deaths to the Superintendent's office. Those records respond, in part, to County Request Nos. 6 and 11. At that point, the office had released no record responsive to County Request Nos. 1–5, 7–10, 12, or 13.

110. On September 16, 2026, Hudson County Counsel placed a telephone call to Plaintiffs' counsel and informed Plaintiffs' counsel that Hudson County would release the remaining records by no later than 5:00 p.m. on September 18, 2026.

111. On September 17, 2026, Hudson County sent an email thanking Plaintiffs for their patience, apologizing for its delay in responding, stating that "[a]ll the documents have been uploaded in the [records] portal and are available to [Plaintiffs]," and asserting that, as to County Request Nos. 3 and 7, the County did not possess responsive records. The email stated that it "conclude[d] [Plaintiffs'] request."

112. The production consisted of more than ninety documents responsive to County Request Nos. 1, 2, 4–6, 11, 12, or 13, but many of these documents are only partially responsive to these requests:

(a) The policy and procedure document titled "Deleting Deceased Voters from Active Voter Roll" is the sole document produced in response to County Request No. 1 and contains no information regarding subparts (b)–(i) of County Request No. 1;

(b) The CSV file provided in response to County Request No. 2 is redacted to exclude each deleted voter's date of birth;

(c) The office's assertion that it has no records responsive to County Request Nos. 3 and 7 is contradicted, as to County Request No. 3, by the office's

own production, as the CSV file shows deletions under "Inactive Confirmation Through Two Federal," each of which presupposes that a confirmation notice was sent and the registrant was placed in inactive status; and, as to County Request No. 7, by the State's acknowledgment that MVC address-change data is transmitted to the SVRS for use by county election officials.

113. As of the filing of this Amended Complaint—more than eight weeks after the request was sent, and after both dates by which Hudson County Counsel committed to deliver the records—Defendant Kelleher's office has, accordingly, (a) failed to produce records in response to County Request Nos. 3 and 7, and (b) produced records that are incomplete in response to County Request Nos. 1, 2, 4–6, and 11–13.

## VII. Defendant Foerst's Partial Production and Refusal (Union County)

114. The request was transmitted on July 31, 2026, by email to the address of the Union County Board of Elections and by certified mail to Defendant Foerst. The Administrator of the Board forwarded the request to the County's OPRA office on August 5, 2026.

115. The request stated Plaintiffs' identities, contact information, the records sought, and the non-commercial purpose of the request.

116. On August 5, 2026, the County's OPRA office wrote that "an updated OPRA request form with the certifications required as per N.J.S.A. 2C:28-3" was attached, and that Plaintiffs' counsel should "fill out and return the form, or make the proper certifications as listed on the form, and your request will be processed." Plaintiffs' counsel returned the completed form, with the request re-attached, by email on August 10, 2026. That re-transmission changed neither the date of the request nor the date on which the office's obligation to respond attached.

117. The same day, the OPRA Compliance Manager in the Office of the Clerk of the Board acknowledged what she described as Plaintiffs' "August 10, 2026, OPRA request for Various voter registration records from January 1, 2023 - present," and stated that, "[i]n accordance with OPRA, a response is due by August 19, 2026."

118. On August 19, 2026, the OPRA Compliance Manager wrote that "some additional time is needed to review and respond to your August 10, 2026, OPRA request," and that the County "expect[s] to respond by September 9, 2026." The email thus re-dated the request to August 10 and proposed to respond forty days after the request was actually made. This communication identified no circumstance requiring the additional time, and it did not mention the NVRA.

119. The County's August 19 communication came after the response deadline that followed from the request's actual July 31 date, and the request was, accordingly, deemed denied under OPRA. *See* N.J.S.A. 47:1A-5(i)(1). Even accepting the County's re-dating of the request to August 10, the August 19 email's bare assertion that additional time is needed identified no circumstance justifying an extension.

120. On August 28, 2026, the County's OPRA office sent what it described as "a formal and complete response to your August 10, 2026, OPRA request." The response stated:

(a) As to County Request No. 1, that a document titled "UCBOE SOP Docs – 3-2024" was attached. The document is a nineteen-page set of standard operating procedures for the Union County Board of Elections, which describes, among other things, how the office processes returned election mail, sends and records verification and confirmation notices, designates registrants inactive, and processes reports of deceased registrants, and which incorporates written guidance the office received from the Division.

(b) As to County Request Nos. 2, 5, and 12, that a "Voter List – Deleted Records with designations from 1-1-2023 – 8-10-2026" was attached, with "[c]overed persons' home addresses deleted – exempt per Daniel's Law, N.J.S.A. 47:1B-1."

(c) As to County Request No. 3, that a "Voter Detail Report – Change Status from Active to Inactive from 1-1-2023 – 8-10-2026" was attached.

(d) As to County Request No. 13, that, "[i]n accordance with OPRA, so the county may process this item, please clarify what is considered 'voter list maintenance activities.'"

(e) As to "the remainder of items requested"—County Request Nos. 4, 6, 7, 9, and 11—that "processing the request as submitted would cause a substantial disruption to the operations of the Board of Elections," that, "[i]n accordance with OPRA, if a request for access to government records would substantially disrupt agency operations, the custodian may deny access after informing the requestor of the potential disruption and attempting to reach a reasonable solution that accommodates both parties," and that Plaintiffs should "advise if you wish to narrow the scope of your request to a more manageable task."

121. The two reports the office produced are incomplete on their face. The deleted-records report lists approximately 25,000 registrants removed under nine of the ten removal codes listed in County Request No. 2, together with each registrant's date of birth and SVRS voter identification number, but it omits the date on which each registrant was removed, a field the request specifically sought, and one that the SVRS records. Although the office also offered the

report as its response to County Request No. 12, it contains no entry identifying any registrant removed as a non-citizen. The report offered in response to County Request No. 3 is not a record of address confirmation notices at all, but rather a log that records roughly 26,000 changes to registrants' voter status, more than 24,000 of which reflect a change *to* active status and fewer than 1,500 of which reflect a change to an inactive status, and it identifies no notice sent to any registrant, no date on which a notice was sent, and no response.

122. On August 31, 2026, Plaintiffs' counsel replied to the County's request for clarification, explaining that "voter list-maintenance activities," as used in County Request No. 13, "encompasses all activities conducted by your office concerning the maintenance (e.g., updating or modification) of Union County's voter roll," and advising the office, with a copy of Plaintiffs' August 26 notice attached, that the request "is brought principally under the National Voter Registration Act, and only invokes New Jersey's OPRA to the extent your office contends any requested record is beyond the NVRA's scope."

123. On September 15, 2026—the final day of the cure period—the County's First Deputy County Counsel responded by email to Plaintiffs' August 26 notice and August 31 clarification. He attached what he described as "the only responsive record in the County['s] possession relative [to] request #13." The attachment is a single email, dated April 29, 2026, from a Supervisory Immigration Officer in the Newark Field Office of USCIS to the Union County Board of Elections, observing that the office "may have experienced more people requesting removal from the voting rolls because they are not U.S. citizens" and offering to meet with the office about "the process for a person to become a U.S. citizen through naturalization."

124. The same email stated that "[t]he County has not received an amended request in response to our Notice of substantial disruption to operations," that "[t]he County of Union will

seek an extension if an amended request is submitted," and asked Plaintiffs to "advise if an amended OPRA/NVRA request will be submitted for the County's review." The County thus reaffirmed its refusal of County Request Nos. 4, 6, 7, 9, and 11, and conditioned any further processing of those requests on Plaintiffs' agreement to narrow them.

125. The ground on which the office refused County Request Nos. 4, 6, 7, 9, and 11—that producing the records would "substantially disrupt" the office's operations—is a creature of OPRA. Section 8(i) contains no such exception. Each refused category seeks records of the office's own list-maintenance activity, including (a) the registrants it has designated inactive (No. 4); (b) the death records on which it relies to remove deceased registrants, whose receipt and processing its own standard operating procedures describe (No. 6); (c) the MVC data on which it relies to identify registrants who have moved (No. 7); (d) its exchanges with ERIC (No. 9); and (e) its communications with other election officials concerning the removal of registrants (No. 11). The office's own status-change report confirms that the SVRS can be queried to identify registrants placed in inactive status, and its non-production of that information in a usable form is a voluntary refusal of the request, not an inherent limitation of the voter registration system.

126. Apart from the single record produced in response to County Request No. 13, Defendant Foerst's office produced nothing further by the September 15, 2026, cure deadline, and it has produced nothing further as of the filing of this Amended Complaint. Essex County, responding to the same request, refused none of those five categories, and identified records responsive to each and produced or agreed to produce them.

127. Defendant Foerst's office has, accordingly, failed to make available any records in response to County Request Nos. 4, 6, 7, 9, 11, and 12; and has provided incomplete records in response to County Request Nos. 2, 3, and 5.

## VIII. Defendant Scherer's Partial Production and Closure of the Request (Somerset County)

128. The request was transmitted on July 31, 2026, by email to the Somerset County Board of Elections' address and by certified mail to the Somerset County Commissioner of Registration at the Board's offices. The Board forwarded the request to the Clerk of the Board of County Commissioners on August 3, 2026.

129. On August 5, 2026, the Clerk of the Board wrote that the County had "received [Plaintiffs'] Open Public Records Act ('OPRA') request on 08/03/2026," that "[t]he seven (7) business day deadline to respond to [Plaintiffs'] request is 08/12/2026," and that the County "anticipates requiring an additional three weeks (until September 2, 2026) to compile, review, and produce the potentially responsive records in accordance with New Jersey law." The email also reserved "the right to request an additional extension of time, if necessary."

130. The email treated the request exclusively as an OPRA request. It did not address the NVRA, and it identified no circumstance beyond the ordinary work of compiling and reviewing records that required three additional weeks.

131. On August 31, 2026, the County's records portal notified Plaintiffs that the request "has been completed" and that Plaintiffs' "Open Public Records request has thus been processed in accordance with N.J.S.A. 47:1A:1 [*sic*] and is now closed." The production consisted of a one-page response sheet, two reports generated from the SVRS, and a set of records offered in response to County Request No. 13.

132. The response sheet stated:

(a) As to County Request No. 1, that "[t]his office strictly adheres to all the policies, guidelines, and procedures set forth in NJ Election Laws including Title 19," and that "the responsive information can be found in the NJ

Election Laws." The office produced no policy, procedure, manual, guidance document, or training material of any kind.

(b) As to County Request No. 2, "[s]ee Report of 'Deleted Voters.'"

(c) As to County Request Nos. 3, 4, 5, and 12, that "[t]his office does not have the ability to generate the list requested."

(d) As to County Request No. 6, that "[t]his office does not have direct contact with the Department regarding records of inquiry in the request."

(e) As to County Request No. 7, "[s]ee Report of MVC voters."

(f) As to County Request No. 8, that "Somerset County does not use the SAVE database."

(g) As to County Request No. 9, that "[n]o records have been directly exchanged between our office and ERIC."

(h) As to County Request No. 10, that "[t]he office does not compare voting records to jury poll questionnaires or records."

(i) As to County Request No. 11, that "[t]his office does not maintain a record of communication with other counties in relation to list maintenance."

(j) As to County Request No. 13, "[a]ppend OPRA and subpoenas." The office produced copies of records requests and legal process it had received from federal agencies concerning the registration status of particular individuals, together with printouts of those individuals' SVRS voter profiles.

133. The "Deleted Voters" report identifies approximately 16,000 registrants removed under eight of the ten removal codes listed in County Request No. 2, together with each registrant's date of birth, SVRS voter identification number, removal code, and date of removal. But the report

covers only removals recorded between July 31, 2024, and July 31, 2026. It omits the first nineteen months of the Relevant Period—January 1, 2023, through July 30, 2024—and every removal recorded during that time.

134. The "MVC voters" report does not respond to County Request No. 7, which sought the records and communications exchanged between the office and the MVC "that identif[y] voters who have moved for voter list-maintenance purposes." The report lists nearly 23,000 registrants whose registrations were recorded in the SVRS as "Agency" registrations between July 31, 2024, and July 31, 2026—that is, persons who registered through the MVC during that period. It identifies no registrant who has moved, and it reflects no data exchanged with the MVC for the purpose of identifying such registrants.

135. The office's assertion that it "does not have the ability to generate" records responsive to County Request Nos. 3, 4, 5, and 12 is contradicted by its own production. The "Deleted Voters" report lists approximately 10,000 registrants removed under the code "Inactive Confirmation Through Two Federal." Each of those entries records the removal of a registrant from the inactive list—the very information County Request No. 5 seeks—and each indicates that the registrant was sent an address confirmation notice, did not respond, and was designated inactive, the information County Request Nos. 3 and 4 seek. The office generated that information from the SVRS in the report it produced. Moreover, the SVRS voter profiles the office produced in response to County Request No. 13 include, for each registrant, a "Correspondence History" generated from the SVRS that lists every notice sent to the registrant by type—"Acknowledgement," "Verification," and "Confirmation"—together with the date on which each was generated and the date on which the registrant responded. The SVRS thus records—registrant by registrant—precisely the information County Request No. 3 seeks and information that Section

8(i)(2) requires the State to maintain and make available. Essex County, responding to the same request, produced SVRS inactivation and removal reports for the Relevant Period.

136. The office's response to County Request No. 6 is likewise contradicted by its production. The "Deleted Voters" report lists roughly 3,500 registrants removed as "Deceased" in two years. Each of those removals rested on a record of the registrant's death that the office received from some source, and County Request No. 6 sought records exchanged not only with the Department of Health but with "any other office, bureau, or agency responsible for maintaining records of deaths." As standard operating procedures produced by Union County and Middlesex County confirm, county election offices in New Jersey receive periodic reports of deaths from municipal registrars and clerks and use them to remove deceased registrants from the rolls. Those reports are records responsive to County Request No. 6, and the office produced none.

137. Defendant Scherer's office closed the request on August 31, 2026. It did not respond to Plaintiffs' August 26, 2026, notice, and it has produced nothing further as of the filing of this Amended Complaint.

138. Defendant Scherer's office has, accordingly, failed to make available any records in response to County Request Nos. 1, 3–6, 11, and 12; has produced incomplete records in response to County Request No. 2; and has produced records unresponsive to County Request No. 7.

## IX. The Statutory Notices and Defendants' Failures to Cure

139. On August 26, 2026, Plaintiffs, through counsel, provided written notice of the violations described above pursuant to 52 U.S.C. § 20510(b)(1).

140. Plaintiffs transmitted the notice to the Secretary by email (to feedback@sos.nj.gov) and by certified mail.

141. Plaintiffs transmitted notices to each county Defendant by certified mail to their offices and by email to the following addresses:

(a) Defendant Francica: soe@bergencountynj.gov;

(b) Defendant Snyder: elections@co.middlesex.nj.us;

(c) Defendant Kelleher: superintendentofelections@hcnj.us;

(d) Defendant Foerst: ucboe@ucnj.org; and

(e) Defendant Scherer: electionbd@somersetcountynj.gov.

142. Copies of these notices are attached hereto as **Exhibit C**.

143. Each notice identified the July 31, 2026, request, described the recipient's response or non-response, explained the basis of the Section 8(i) violation, and demanded that the recipient cure the violation by completing production of the requested records.

144. The notice to the Secretary further explained that the State is responsible for all list-maintenance records, including the records not provided by the county officials named in this action. Accordingly, the Secretary must produce NVRA records maintained by her office and by all New Jersey counties.

145. The notice to the Secretary enclosed copies of the county notices.

146. Each notice stated that, because the violation occurred within 120 days before the date of an election for federal office—the November 3, 2026, general election (the 120-day period before which began on July 6, 2026)—the recipient had twenty days from receipt of the notice, or until September 15, 2026, to cure the violation. *See* 52 U.S.C. § 20510(b)(2).

147. Each Defendant, or his or her office, received the notice directed to him or her via email on or about August 26, 2026.

148. In addition, each Defendant, or his or her office, received the notice directed to him or her via certified mail on or about August 31, 2026.

149. More than twenty days have elapsed since each Defendant's receipt of the notices. No Defendant cured his or her respective violation by September 15, 2026, or at any time since.

## STANDING

150. Each Plaintiff has suffered, and continues to suffer, injuries that are concrete, particularized, and actual or imminent.

### I. Informational Injury

151. Section 8(i) entitles members of the public, including each Plaintiff, to inspect and copy all records concerning the implementation of New Jersey's voter list-maintenance programs and activities. Each Plaintiff requested such records from each Defendant, and each Defendant has withheld them. The denial of access to information to which a statute entitles a requester is a concrete informational injury sufficient to support Article III standing. *See Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989); *FEC v. Akins*, 524 U.S. 11, 21 (1998); *Pub. Int. Legal Found. v. Nago*, 174 F.4th 664, 671 (9th Cir. 2026) (first citing *Pub. Citizen*, 491 U.S. at 449; and then citing *Akins*, 524 U.S. at 21).

152. Each Plaintiff suffers that injury as to each category of records that each Defendant has failed to produce. That injury extends, as to the Secretary, to State Request Nos. 1, 3, and 5–11, in their entirety, and State Request Nos. 2 and 4, in part; as to Defendant Francica, to County Request Nos. 1, 3, 4, 6, 7, 11, and 13, in their entirety, and County Request Nos. 2, 5, and 12, in part; as to Defendant Snyder, to County Request Nos. 2–7, 11, and 12, in their entirety, and County Request Nos. 1 and 13, in part; as to Defendant Kelleher, to County Request Nos. 3 and 7, in their entirety, and County Request Nos. 1, 2, 4–6, and 11–13, in part; as to Defendant Foerst, to County Request Nos. 4, 6, 7, 9, 11, and 12, in their entirety, and County Request Nos. 2, 3, and 5, in part;

and as to Defendant Scherer, to County Request Nos. 1, 3–7, 11, and 12, in their entirety, and County Request No. 2, in part.

153. The withholding also inflicts downstream harms that Section 8(i)'s disclosure mandate exists to prevent. Without the requested records, Plaintiffs cannot evaluate whether New Jersey's list-maintenance programs are being implemented lawfully and effectively; cannot identify errors in the maintenance of the rolls on which their activities depend; and cannot inform their members, their candidates, and the public about the administration of New Jersey's elections.

## II. Injury to Plaintiffs' Programs and Activities

154. Each withheld category of records serves a present use in Plaintiffs' programs and activities in advance of the November 3, 2026, general election and will serve a future use in Plaintiffs' programs and activities in advance of future New Jersey elections.

155. The list-maintenance policies, procedures, and training materials sought by State Request No. 1 and County Request No. 1 would inform how Plaintiffs design their registration, turnout, and monitoring programs; train their volunteers and observers; and assess whether Defendants' practices comply with federal law.

156. The SVRS removal records sought by State Request No. 2 and County Request No. 2 would identify eligible citizens whose registrations were canceled during the Relevant Period—including citizens removed in error—so that Plaintiffs can direct their registration drives toward those citizens in advance of election registration deadlines.

157. The confirmation-notice, inactive-status, and inactive-removal records (State Request Nos. 3–5 and County Request Nos. 3–5)—records Section 8(i)(2) expressly identifies—would identify registrations at risk of removal and registrants in inactive status, whom Plaintiffs would contact through their registration, communication, and turnout programs, and would allow

Plaintiffs to build accurate contact universes rather than expending resources on outreach to registrants who have been removed, have moved, or are deceased.

158. The records of Defendants' data exchanges with Vital Statistics, the MVC, SAVE, ERIC, other election officials, and USCIS (State Request Nos. 6–10; County Request Nos. 6–7, 11, and 13), and the records of registrants removed as non-citizens (State Request No. 11; County Request No. 12), would allow Plaintiffs to assess whether the sources New Jersey uses to identify deceased, relocated, duplicate, and non-citizen registrants are functioning, and to direct their monitoring and voter-education efforts accordingly.

159. The RNC and NJGOP plan, budget, and execute their New Jersey registration drives, get-out-the-vote programs, voter communications, and election-monitoring operations in advance of voter registration deadlines. Defendants' withholding forces those programs to proceed on stale information, degrades their precision, and compels broader and costlier outreach than accurate records would require.

## III. Competitive Injury to Plaintiffs as Election Participants

160. The RNC, NJGOP, Congressman Kean, and Senator Bucco are participants in, and competitors for votes in, the elections that New Jersey administers on the rolls whose maintenance the requested records document. A candidate for office has a concrete and particularized interest in the lawful administration of the election in which the candidate is running that is distinct from the general interest of the public. *See Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 76–78 (2026). The political parties that nominate and support those candidates share that interest. *See Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2425 (2026) ("Political parties . . . occupy a unique position with 'a special relationship and unity of interest' with candidates." (quoting *McConnell v. FEC*, 540 U.S. 93, 145 (2003))).

161. The integrity of election administration thus directly affects Plaintiffs, their candidates, and their members. Inaccurate rolls can produce inaccurate results, decrease public confidence in election outcomes, and deter citizens from voting, to Plaintiffs' detriment. Conversely, elections administered on accurate rolls increase public confidence, encourage citizens to vote, and enhance Plaintiffs' electoral prospects. *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."). The maintenance of accurate voter registration lists is a central and necessary component of election integrity, and the denial of access to the records needed to evaluate that maintenance degrades Plaintiffs' contact universes relative to the resources they deploy, inflicting concrete competitive and financial injury on Plaintiffs in elections in which they are direct participants.

## IV. Associational Standing

162. The RNC and NJGOP also sue on behalf of their members, who include registered New Jersey voters and Republican candidates for federal and state office in New Jersey, including in each of the five counties whose election officials are named as Defendants here.

163. These members rely on accurate voter rolls to exercise the franchise and seek office, and they share the RNC's and NJGOP's interest in the requested information described above.

164. The RNC's and NJGOP's members would have standing to sue in their own right, the interests at stake are germane to the RNC's and NJGOP's purposes, and neither the claim asserted nor the relief requested requires the participation of individual members.

## V. The Candidate Plaintiffs' Injuries

165. Congressman Kean is a candidate on the November 3, 2026, ballot in an election conducted on the very rolls the requested records document, in a district that includes portions of Somerset and Union Counties. As a candidate, Congressman Kean has a concrete and

particularized interest in the accuracy of those rolls and in the lawful administration of the list-maintenance programs that shape them. *See Bost*, 607 U.S. at 76–78. The requested records would enable Congressman Kean's campaign to direct its registration and turnout efforts toward eligible voters in his district and to monitor the administration of his election. The withholding of the requested records injures him in that capacity, in addition to the informational injury he suffers as described above.

166. Senator Bucco will be a candidate for re-election in New Jersey's 2027 general election, which will be conducted on the same voter rolls, maintained through the same statewide programs and the same SVRS, that the requested records concern. Because Section 8(i) requires the State to maintain its list-maintenance records for at least two years, the records Plaintiffs requested document the maintenance of the rolls on which Senator Bucco's election will run. Withholding the requested records injures Senator Bucco in his capacity as a candidate, in addition to the informational injury he suffers as described above.

### VI. Traceability and Redressability

167. Plaintiffs' injuries are directly traceable to each Defendant's withholding of the requested records, and an order compelling Defendants to make those records available would redress those injuries.

## CLAIMS FOR RELIEF

### Count I – Violation of Section 8(i) of the National Voter Registration Act, 52 U.S.C. § 20507(i)

### (Against All Defendants)

168. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

169. Section 8(i) of the NVRA requires that all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of New Jersey's official lists of eligible voters be maintained for at least two years and made available for public inspection and, where available, copying upon request and at a reasonable cost. 52 U.S.C. § 20507(i)(1).

170. Each Defendant is an election official responsible for implementing New Jersey's voter list-maintenance programs and for maintaining and making available the records of those programs. The Secretary is the State's chief election official and administers the SVRS at the State level; each county Defendant conducts the county-level list-maintenance activities through which New Jersey's program operates and holds, or can generate from the SVRS, the records of that activity.

171. Plaintiffs' July 31, 2026, requests were proper requests for records covered by Section 8(i). Each enumerated category in each request concerns the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of New Jersey's official lists of eligible voters, and several categories are records that Section 8(i)(2) identifies by name.

172. The Secretary has violated Section 8(i) by failing to make available any record in response to State Request Nos. 1, 3, and 6–10; by producing incomplete records in response to State Request Nos. 2 and 4; and by offering, in response to State Request Nos. 5 and 11, records that do not identify the registrants those requests seek. The Secretary is further responsible for the violations arising from the county Defendants' failures and refusals. *See Missouri*, 535 F.3d at 849–51.

173. Defendant Francica has violated Section 8(i) by refusing and failing to make available records responsive to County Request Nos. 1, 3, 4, 6, 7, 11, and 13, and by producing incomplete records in response to County Request Nos. 2, 5, and 12.

174. Defendant Snyder has violated Section 8(i) by refusing and failing to make available records in response to County Request Nos. 2–7, 11, and 12, and by producing incomplete records in response to County Request Nos. 1 and 13.

175. Defendant Kelleher has violated Section 8(i) by failing to make available records responsive to County Request Nos. 3 and 7, and by producing incomplete records in response to County Request Nos. 1, 2, 4–6, and 11–13.

176. Defendant Foerst has violated Section 8(i) by refusing and failing to make available records responsive to County Request Nos. 4, 6, 7, 9, 11, and 12, and by producing incomplete records in response to County Request Nos. 2, 3, and 5.

177. Defendant Scherer has violated Section 8(i) by failing to make available records responsive to County Request Nos. 1, 3, 4, 5, 6, 11, and 12; by producing incomplete records in response to County Request No. 2; and by producing records unresponsive to County Request No. 7.

178. The records that the Secretary has failed to make available, and that Plaintiffs seek through this action, include, at a minimum, the following:

(a) The policies, procedures, manuals, directives, guidance documents, and training materials that set forth or describe New Jersey's list-maintenance programs and activities, including the guidance documents that the Division states it has been "reviewing, updating, and preparing"; the written guidance concerning list maintenance that the Division has issued to county election

officials, including the guidance incorporated into the Union County Board of Elections' standard operating procedures, and those of Middlesex County; and the records that set forth the meaning and application of each removal code or cancellation reason used in the SVRS (State Request No. 1);

(b) For each registrant deleted from the SVRS during the Relevant Period, the reason that the SVRS user selected for the deletion, which the SVRS records and which the Division omitted from the list of deleted voters that it produced (State Request Nos. 2, 5, and 11);

(c) The "correspondence history" data maintained in the SVRS that identifies each registrant to whom an address confirmation notice was sent during the Relevant Period, the date of each notice, and whether the registrant responded (State Request No. 3);

(d) The SVRS data that identifies each registrant placed in inactive status during the Relevant Period and the date on which the registrant was placed in that status (State Request No. 4);

(e) The data files that the SVRS retrieves from the New Jersey Department of Health to identify deceased registrants, together with any death lists or indices, match or comparison results, and correspondence transmitting or discussing that information (State Request No. 6);

(f) The change-of-address records that the MVC transmits to the SVRS for review and use by county election officials, together with any lists, match

or comparison results, and correspondence transmitting or discussing that information (State Request No. 7);

(g) The In State Duplicate Reports that the Division acknowledges receiving from ERIC, and each other record and communication exchanged between the Division and ERIC during the Relevant Period (State Request No. 9);

(h) The directives, instructions, guidance, schedules, and other records and communications exchanged between the Division and county election officials that concern list-maintenance programs and activities, that concern any failure to comply with list-maintenance obligations, or that identify registrants removed, or to be removed, from the rolls (State Request No. 10);

(i) The records in the Division's possession that identify each person removed from the SVRS during the Relevant Period because the person was not a United States citizen (State Request No. 11); and

(j) To the extent the county Defendants do not make them available, the records identified in the following paragraph, including those that reside in, or can be generated from, the SVRS that the Secretary administers.

179. The records that the county Defendants have failed to make available, and that Plaintiffs seek through this action, include the following:

(a) The written policies, procedures, manuals, directives, guidance documents, and training materials under which each office conducts its list-maintenance activities, whether issued by the office itself or by the Division (County Request No. 1);

(b) SVRS reports identifying each registrant removed or canceled during the Relevant Period under the removal codes enumerated in County Request No. 2, including the fields and periods variously omitted from the reports produced to date—namely, registrants' dates or years of birth, the date of each removal, and the removals recorded between January 1, 2023, and July 30, 2024 (County Request No. 2);

(c) SVRS reports or "Correspondence History" data identifying each registrant to whom the office sent an address confirmation notice during the Relevant Period, the date of each notice, and whether the registrant responded (County Request No. 3);

(d) SVRS reports identifying each registrant placed in inactive status during the Relevant Period and the date of each such change in status, and each registrant removed from the inactive list during the Relevant Period (County Request Nos. 4 and 5);

(e) The reports of deaths that each office receives from the New Jersey Department of Health, municipal registrars, and other sources, and on which it relies to remove deceased registrants, together with any correspondence transmitting or discussing those reports (County Request No. 6);

(f) The MVC change-of-address data transmitted to the SVRS for each office's review and use in identifying registrants who have moved, together with any correspondence transmitting or discussing that data (County Request No. 7);

(g) The records and communications that each office has exchanged with other county election officials and municipal clerks concerning list-maintenance programs and activities, failures to comply with list-maintenance obligations, and registrants removed, or to be removed, from the rolls (County Request No. 11);

(h) The records identifying each registrant removed from the SVRS during the Relevant Period because the registrant was not a United States citizen, including registrants' dates or years of birth where omitted from the reports produced to date (County Request No. 12); and

(i) The records and communications that each office has exchanged with USCIS relating to citizenship and voter list maintenance (County Request No. 13).

180. The foregoing enumeration is illustrative, not exhaustive. Because the requested records are within Defendants' exclusive possession, custody, or control, Plaintiffs cannot presently identify every responsive record that Defendants have withheld. Accordingly, Plaintiffs seek all records responsive to their July 31, 2026, requests that Defendants have not made available, including any responsive records whose existence is revealed by Defendants' further productions or through discovery in this action.

181. The grounds on which Defendants have refused, conditioned, or limited production are grounds supplied by state law or by no law at all. None has any counterpart in Section 8(i), and none excuses a failure to make list-maintenance records available under federal law. Nor does the fact that responsive data must be retrieved from the SVRS by query excuse its non-production. Section 8(i) reaches data maintained in a statewide voter registration system, and Defendants' own

productions demonstrate that the SVRS is routinely queried to generate reports of precisely the kind Plaintiffs requested.

182. To the extent New Jersey law would permit Defendants to withhold, redact, or condition access to the requested records, it is preempted. *See Bellows*, 92 F.4th at 54–55.

183. Plaintiffs provided to each Defendant written notice of the violations on August 26, 2026, in accordance with 52 U.S.C. § 20510(b)(1). Because the violations occurred within 120 days before the November 3, 2026, election for federal office, Defendants had twenty days from receipt of the notices to correct the violations. 52 U.S.C. § 20510(b)(2). No Defendant did so.

184. Defendants' violations of Section 8(i) are ongoing, and Plaintiffs will continue to suffer the injuries alleged herein unless and until Defendants are ordered to make the requested records available.

185. Plaintiffs are entitled to a declaration that Defendants have violated Section 8(i), to injunctive relief compelling Defendants to make the requested records available, and to their reasonable attorneys' fees, litigation expenses, and costs, pursuant to 52 U.S.C. § 20510(b)(2), (c).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Declare that each Defendant has violated Section 8(i) of the NVRA, 52 U.S.C. § 20507(i), by failing to make available for public inspection and copying the records requested by Plaintiffs on July 31, 2026;

(b) Declare that, to the extent any provision of New Jersey law would permit Defendants to withhold, redact, or condition access to the records requested by Plaintiffs on July 31, 2026, that provision is preempted by Section 8(i) of the NVRA;

(c) Order each Defendant to make available to Plaintiffs, for public inspection and copying, all records responsive to Plaintiffs' requests (dated July 31, 2026), including the records identified in Count I, and the records to be identified through discovery, that have not been provided, within fourteen days of the Court's order, on a rolling basis as records are gathered, in electronic format, with data maintained in the SVRS produced in machine-readable format and including each registrant's name, residence address, date or year of birth, and SVRS voter identification number, together with a log identifying any record withheld and the specific basis for each withholding, and without conditioning production on the payment of any special service charge, deposit, or fee, other than the reasonable cost of copying;

(d) Order the Secretary to take all steps necessary to ensure the complete and timely production of the records responsive to the requests directed to the county Defendants, including, as necessary, by generating responsive county-level records through the SVRS;

(e) Retain jurisdiction over this action to ensure Defendants' compliance with the Court's orders;

(f) Award Plaintiffs their reasonable attorneys' fees, including litigation expenses and costs, pursuant to 52 U.S.C. § 20510(c); and

(g) Grant such other and further relief as the Court deems just and proper.

DATED: October 1, 2026

Respectfully submitted,

*/s/ Josiah Contarino*

Josiah Contarino
NJ Bar No. 003962013
CONTARINO ROTH LLC
101 Eisenhower Parkway, Suite 300
Roseland, NJ 07068
(973) 200-1926
jcontarino@contarinoroth.com

Lee E. Goodman (*pro hac vice* forthcoming)
lgoodman@dhillonlaw.com
Domenic P. Aulisi (*pro hac vice* forthcoming)
daulisi@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(703) 574-1093

*Attorneys for Plaintiffs*

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**

Pursuant to Local Civil Rule 11.2, the undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

DATED: October 1, 2026

*/s/ Josiah Contarino*
Josiah Contarino